# IN RE LYON.

PATENTS; NOVELTY; ANTICIPATION.

An advertising device to be used in connection with a telephone, and auto-matically operated by the removal of the telephone receiver from its hook, is anticipated by a similar device used in connection with a cigar lighter, and operated in the same way by the lifting of the light-er from its hook, and by a device for utilizing in a different way a telephone for the display of advertisements. (Following *Re Mason*, 31 App. D. C. 539, and distinguishing *Re McCreery*, 12 App. D. C. 517, and *Re Eastwood*, ante, 291.

No. 567.  Patent appeals.  Submitted March 11, 1909.  Decided October 19, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting an application for a patent. *Affirmed.*

The facts are stated in the opinion.

*Mr. C. J. Williamson* and *Mr. Edwin J. Prindle* for the appellant.

*Mr. Webster S. Ruckman* for the Commissioner of Patents.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an appeal [by Elias Atherton Lyon] from the deci-

sion of the Commissioner of Patents, rejecting an application for a patent having the following claims:

"1. The combination with a telephone, of a movable advertising device, and connections whereby the placing of the telephone in condition for use causes the movement of said advertising device.

"2. The combination with a telephone, of a movable advertising device, the connections between said device and the receiver hook of said telephone, whereby, upon the movement of said hook, said advertising device shall be operated.

"3. The combination with a telephone, of an advertising device having a series of advertisements thereon, connections between the switch of said telephone and said advertising device, whereby, upon the movement of said switch to place said telephone in condition for use, said advertising device shall be operated to bring one of said series of advertisements into view and then to come to rest.

"4. The combination with a telephone, of an advertising device having means for winding up and unwinding a band that has advertisements thereon, and connections whereby, when said telephone is placed in condition for use, said advertising device will be automatically actuated to move said band, first in one direction and then in the opposite direction.

"5. The combination with a telephone, of an advertising device having means for winding up and unwinding a band that has advertisements thereon, and connections whereby, when said telephone is placed in condition for use, said advertising device will be automatically actuated to move said band step by step, first in one direction and then in the opposite direction."

The subject-matter of the application is an advertising device attached to the box of an ordinary wall telephone. The device consists of a band of paper carrying a number of advertisements, and a mechanism by which the band is operated to bring the advertisements successively into view. The motor mechanism is set in motion by the receiver hook of the telephone. When one goes to use the telephone an advertisement is in view. When he takes the receiver from the hook, the machine causes the

band to make a slight movement, with a sound to attract attention. It then pauses, and when the receiver is hung on the hook again, the band is made to travel the full length of the next advertisement, bringing it into place where it may be observed by the next user of the telephone, whose attention will be attracted by the sound following his removal of the receiver from its hook.

The application was rejected for want of novelty on reference to the following patents: Whitney, October 28, 1902, No. 712,223; Bannan, May 12, 1903, No. 727,880; Sanford, August 23, 1904, No. 768,240.

Whitney's patent shows an advertising device with an endless band bearing advertisements, and means for moving the band the space of an advertisement at a time. The operating means consists of a spring-retracted hooked arm or lever quite like the hooked support of the telephone receiver, adapted to support a suitable weight, which may be an automatic cigar lighter; also a pawl and ratchet mechanism connected to the lever and one of the wheels over which runs the endless band, so that each time the weight is released and the lever is retracted by its spring, the pawl and ratchet are operated one step and a new advertisement is presented to view. Sanford's patent shows an electric indicator on which a band bearing advertisements, particularly the names of streets and stations, is wound from one drum to another, and then the operation is reversed as in applicant's device. Its particular use is in street and railway cars, stations, etc. Bannan's patent is for advertising purposes in connection with telephones. It consists of a sheet metal plate attached to the transmitter on which telephone numbers may be written and advertisements displayed.

The appellant asserts that the great value of his invention is due to two things: 1. The utilization of the telephone receiver and its supporting hook, which are already in existence, thus rendering it unnecessary to construct or provide any special mechanism for causing the operation of the advertising device; 2. As the user must be at a phone, waiting for the desired connection, a splendid opportunity is afforded for the

display of advertising matter, so that, almost against his will, he is obliged to read what is presented before him; moreover, the telephone provides the means of at once ordering that which is the subject of an advertisement. He does not claim invention of any one of the elements of the combination, but in the combination of a traveling advertisement carrier, a telephone, and a lever which is the connecting link between the advertising mechanism and the telephone, the one lever coacting with the telephone and also with the advertising mechanism. He states in his brief that "the invention consisted not so much in devising instrumentalities, but in the thought of using an apparatus, or the parts of an apparatus already in existence for one purpose, for another purpose." And again he states: "The ingenuity of the appellant consists in making one mechanism serve a double purpose. That is to say, appellant takes the telephone that is made for the purpose of telephoning, and compels certain parts of it to do service in working an advertising device. This case is one wherein the invention lies in the conception or thought that the telephone which is provided for one purpose may be rendered useful for another purpose."

It appears, however, from Bannan's patent, that this idea of utilizing the telephone for the display of advertisements first occurred to him, though he carried it out in a different way. On the other hand, the idea of operating a movable band advertising device by means of a lever for switching the electric current, which was set in motion by removing a weight from, or restoring it to, a hook support, first occurred to Whitney. He preferred to make this weight a cigar lighter, which hangs on the hook in the same manner that a telephone receiver does. Knowing, then, that a telephone box had been conceived by Bannan as a suitable place for the display of advertising matter to the users of the telephone, and that Whitney had used the movable band device, controlled by a lever operating in the same way as the lever of the telephone apparatus, did the idea of substituting the Whitney device for that of Bannan, and attaching it to the lever of the telephone box instead of a similar lever attached to some other support, amount to invention?

We agree with the tribunals of the Patent Office that it did not. *Millett* v. *Allen*, 27 App. D. C. 70, 76, and cases there cited; *Re Mason*, 31 App. D. C. 539.

The new use claimed for the telephone itself amounts to nothing more than the use conceived by Bannan; namely, as a place for the display of advertisements. The use of the telephone lever as a means for communicating motion to the movable band device substituted for Bannan's method of display was not a new, but an additional use for that lever, readily suggested by the method of Whitney's operation. The ordinary switching lever is made to operate in the same way to perform a similar function. The combination of applicant amounts only to an aggregation of familiar elements which operate in the combination as they formerly did separately.

There was no joint operation productive of a new result. In view of what was already known, the thought which prompted the combination is no more invention than that which produced the combination of pencil and eraser, through the insertion of a piece of rubber in one end of an ordinary lead pencil, a patent for which was held void in *Reckendorfer* v. *Faber*, 92 U. S. 347, 23 L. ed. 719.

The cases cited by the appellant are distinguishable from this. *Hobbs* v. *Beach*, 180 U. S. 383, 45 L. ed. 586, 21 Sup. Ct. Rep. 409; *Wold* v. *Thayer*, 78 C. C. A. 350, 148 Fed. 227; *Stilwell-Bierce & S. V. Co.* v. *Eufaula Cotton Oil Co.* 54 C. C. A. 584, 117 Fed. 410; *Re McCreery*, 12 App. D. C. 517. In *Hobbs* v. *Beach*, which is chiefly relied on, the Dennis and York device, claimed as an anticipation, had been used solely for pasting addresses upon newspapers. Neither it nor any other machine had ever been used for pasting paper strips on the corners of boxes. It had to be changed materially to make it capable of such use. The functions of the two machines were analogous, but not similar, and it was said that the Beach machine involved invention, first, to see that the old machine was adaptable to the work of the Beach device, and, second, to make the changes necessary to adapt the old device to

the new functions. In the other cases, changes were made by which new and useful results were achieved.

Nor is there any support for the appellant's contention in the recent case of *Re Eastwood, ante,* 291. There the combination of a mental or skull-cracking weight with a lifting magnet and a traveling crane was held to be new. While a lifting magnet had been used in a combination with a traveling crane, Eastwood was the first to combine the three elements, producing a novel and useful result.

In the present case the Whitney hook, as we have seen, performs the same functions in his combination that is performed by the telephone hook in the appellant's. There is such similarity in the mode of operation of the Whitney hook and the telephone hook that one readily suggests the other.

We find no error in the decision, and it will be affirmed. It is so ordered, and that the Clerk certify this decision to the Commissioner of Patents, as the law requires. *Affirmed.*

---

# LANG *v.* GREEN RIVER DISTILLING COMPANY.

---

TRADEMARKS; SIMILARITY OF MARKS.

1. The words "Green Ribbon," as applied to whisky, so nearly resemble the words "Green River," already registered as a trademark for whisky, as to be likely to cause confusion to the public or to deceive purchasers; and registration of them is therefore properly refused by the Commissioner of Patents, especially where there are circumstances indicating that when the applicant, a retail dealer in whisky, adopted the mark, he had in mind the registered mark, which was that of manufacturers of whisky, and had been long applied by them to a well advertised and established article.

2. Whether a mark is or is not registerable as a trademark, because of alleged similarity to another, depends upon the special facts and circumstances of the case.

No. 573. Patent Appeals. Submitted May 17, 1909. Decided June 1, 1909.
Rehearing denied, October 22, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in a trademark interference case.          *Affirmed.*

The facts are stated in the opinion.

*Mr. E. T. Fenwick* for the appellant.

*Messrs. Dudley, Browne, & Phelps* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The appellant, Sam Lang, made application for the registration of a trademark for whisky, consisting of the words "Green Ribbon," in large printed letters, beneath which is a monogram consisting of the letters S. L. within a circular wreath. After some amendments to the application, unimportant to mention, the application was allowed and passed to publication on April 22, 1907. June 6, 1907, the Green River Distilling Company filed an opposition to the registration. It alleged that the words "Green River" had been adopted and used as a trademark for whisky by J. W. McCulloch in 1890, and continuously used thereafter by him and his successor, said Company, of which corporation McCulloch was the president. The right to use said mark had been assigned to said company at the time of its organization, in 1903. It was alleged that he had registered the words as a trademark on December 25, 1900; that the company had registered it on August 8, 1905, and re-registered it on January 13, 1907. The final allegation was that the words "Green Ribbon," which Lang sought to register, are so nearly alike "Green River" in sound and appearance as to be likely to cause confusion in the trade, and to permit applicant's goods to be substituted for opposer's, to the damage of the business and reputation of the latter.

The Examiner of Interferences was of the opinion that the real question was whether the respective words "Green Rib-

bon" and "Green River" were so nearly alike as to be liable to confuse the public.

Much testimony was taken, from which it clearly appears that Green River had been adopted as a trademark and used since 1890 by McCulloch and his successor, on a high-grade distilled whisky made in a distillery owned by McCulloch, and by him sold to the company, that was located near the Green River, in Kentucky. It also appears that the said whisky, so marked, had been widely advertised throughout the United States, and has been sold extensively in this country and abroad. It appears that Sam Lang is a retail dealer in liquor in the cities of Denver and Cripple Creek, in the state of Colorado. He applied the mark "Green Ribbon" to whisky bottled by him, the place of manufacture of which was not shown. Nor does it appear at what date Lang commenced the use of the mark. This whisky does not appear to have had an extensive sale, and there are some circumstances in evidence which would lead to an inference that Lang adopted the mark with a view to obtaining the benefit of the reputation of the Green River whisky, which was well established in Denver and other places in the state of Colorado. The testimony of manufacturers and dealers in whisky, on behalf of the appellee, tended to show that the general public would likely be confused and deceived by the similarity of the respective marks. Testimony of witnesses on behalf of Lang, among whom were barkeepers in his employ, and users and sellers of whisky, tended to show that there would be no confusion in the marks by the public. The Examiner held that there was no resemblance sufficient to produce confusion, and dismissed the opposition. On appeal to the Commissioner, this decision was reversed, and the opposition sustained.

Under the testimony we think it immaterial to inquire into the registration obtained by the appellee under the ten-years' clause of the trademark act, or to consider whether the appellant would be entitled to registration of Green Ribbon as a technical trademark. The substantial question, as stated by the tribunals of the Office, is as to whether the proposed trade-

mark, Green Ribbon, so nearly resembles the trademark of the appellee, "as to be likely to cause confusion or mistake in the mind of the public, or to deceive purchasers." Sec. 5, trademark act [33 Stat. at L. 727, chap. 592, U. S. Comp. Stat. Supp. 1907, p. 1010]. As said by Mr. Justice Bradley: "Similarity, not identity, is the usual recourse when one party seeks to benefit himself by the good name of another. What similarity is sufficient to effect the object has to be determined in each case by its own circumstances. We may say, generally, that a similarity which would be likely to deceive or mislead an ordinary, unsuspecting customer is obnoxious to the law." *Celluloid Mfg. Co.* v. *Cellonite Mfg. Co.* 32 Fed. 94, 97.

The dominating feature of appellant's mark is the words, "Green Ribbon," printed in large letters. Green River whisky had been well advertised and had an established reputation as an excellent article. As intimated above, there are some circumstances to indicate that, when Lang undertook to introduce his whisky, he had in mind the mark of the appellee. The word "Green" is the first object that attracts the eye of the purchaser when seen, and the ear when uttered. River and Ribbon are somewhat similar when represented or sounded. That Lang used the monogram and a label differing in color of background from that of appellee does not weaken the inference as to his intention in adopting the conspicuous feature of the mark. Had he wanted to avoid all confusion with appellee's mark, he could readily have found another and as attractive a name for his product. There is nothing in the evidence tending to show any other circumstance suggesting the name adopted, other than its resemblance to the well-known mark of the appellee.

As was said by the Commissioner, the similarity of the labels is far more striking than their dissimilarity. And we agree in his conclusion as thus stated: "The words as pronounced are not easily distinguishable, and the appearance of 'Green Ribbon' upon a bottle of whisky, without opportunity for comparison with a bottle containing the label bearing the mark 'Green River,' would be likely to cause confusion in the mind of the public."

We have not deemed it important to review the many cases in which the question of similarity and confusion has been considered. These, or most of them, will be found in the decisions below and in the briefs of counsel. In the application of the general principle which is embodied in the statute, each particular case turns upon its own special facts and circumstances, and it would be practically impossible to find another substantially identical in respect of these.

Being of the opinion that there was no error in the decision, it will be affirmed; and the Clerk will certify this decision to the Commissioner of Patents. *Affirmed.*

A motion for a rehearing was overruled October 22, 1909.

---

## IN RE WRIGHT.

## IN RE GRAVES.

## IN RE TAYLOR.

---

TRADEMARKS; TEN YEARS' USE; FRAUD.

1. Applicants for registration of a mark as a trademark for whisky, under sec. 5 of the trademark act of Congress of February 20, 1905, on the ground that they were in the exclusive use of it as a trademark for ten years prior to the passage of the act, are not entitled to registration, where it appears that they used the mark on goods advertised and represented to be pure whisky, when in fact their product was a blend and compound, respectively. (Following *Levy* v. *Uri*, 31 App. D. C. 441.)

2. In a trademark interference involving the question of prior use of a mark applied to whisky under the ten-year clause of the trademark act of Congress of 1905, where two of the applicants have been found not to be entitled to registration, because of fraud practised on the public by applying the mark to a blend and a compound while advertising

and selling the product as pure whisky, the third party is not entitled to registration on the ground that the compound and imitation whiskies of his opponents are not goods of the same descriptive qualities as pure whisky, and that therefore he must be said to have had the exclusive use of the mark; as all such products belong to one general class, and are merchandise of the same descriptive properties, within the meaning of that act. (Citing *Worcester Brewing Corp.* v. *Rueter & Co.* 30 App. D. C. 428; *Levy* v. *Uri*, supra; and *Phœnix Paint & Varnish Co.* v. *John T. Lewis & Bros. Co.* 32 App. D. C. 285.)

Nos. 576, 577, and 579. Patent Appeals. Submitted May 18, 1909. Decided June 1, 1909. Rehearing denied October 22, 1909.

HEARING upon appeals by three applicants for registration of a trademark, who had been placed in interference, from a decision of the Commissioner of Patents, refusing registration of the marks of all of them.                    *Affirmed.*

The facts are stated in the opinion.

*Mr. Arthur E. Wallace* for the appellants Wright & Taylor.

*Mr. Samuel L. Powers* for the appellants C. H. Graves & Sons.

*Mr. George W. Rea* and *Mr. J. G. Carlisle* for the appellants E. H. Taylor, Jr., & Sons.

*Mr. Frederick A. Tennant* for the Commissioner of Patents.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

These cases come here on appeal from a decision of the Commissioner of Patents in a trademark interference, involving the right to the registration of trademarks for whisky, the dominating feature of each being the word "Taylor." All of the applications were refused by the Commissioner. The marks sought to be registered are indicated opposite the names of the respective applicants, as follows: Taylor & Williams, "Old

Taylor;" Wright & Taylor, "Kentucky Taylor;" C. H. Graves
& Sons, "G. A. Taylor;" and E. H. Taylor, Jr., & Sons,
"Taylor." No appeal was taken by Taylor & Williams; hence,
they are eliminated from this inquiry.

The Commissioner found that the marks sought to be regis-
tered are not technical trademarks. Each of the parties claim
the right to register under the following provision of sec. 5 of
the trademark act of February 20, 1905: "That nothing here-
in shall prevent the registration of any mark used by the appli-
cant or his predecessors, or by those from whom title to the mark
is derived, in commerce with foreign nations or among the
several States, or with Indian tribes, which was in actual and
exclusive use as a trademark of the applicant or his predecessors
from whom he derived title for ten years next preceding the
passage of this act." [33 Stat. at L. 726, chap. 592, U. S.
Comp. Stat. Supp. 1907, p. 1010.] It is clear that the marks
before us are not registerable as technical trademarks. The
right to registration under the above statute is the sole question
to be considered. It is conceded that each of the marks in ques-
tion was used continuously by the party here claiming it for
more than ten years prior to February 20, 1905.

The Commissioner of Patents found from the evidence that
Wright & Taylor and C. H. Graves & Sons had been using their
marks on goods purporting, from the advertisements and repre-
sentations contained on the labels, to be pure whisky, when, in
fact, the whisky was either a blend or a compound. The fraud
thus practised upon the public was held, upon the authority of
*Levy* v. *Uri,* 31 App. D. C. 441, to be sufficient to devest these
parties of any standing in the Patent Office. We agree with the
Commissioner that the evidence shows that the marks were used
by Wright & Taylor and C. H. Graves & Sons on whisky repre-
sented to be pure, when, in fact, construing the evidence most
liberally in their favor, it was only entitled, in the case of the
former, to be marked a compound, and, in the latter, a blend.
We also find no fraudulent or deceptive use of the mark by
E. H. Taylor, Jr., & Sons.

Having established this fact as to their opponents, E. H. Tay-

lor, Jr., & Sons insist that they have had exclusive use of the trademark in issue for ten years next preceding the passage of the trademark act, inasmuch as the opposing parties are shown to have used their marks deceptively during that period. This contention is based upon the theory that compound and imitation whiskies are not goods of the same descriptive qualities as pure, straight whisky. This argument would have great force in a court of equity in a suit for infringement or unfair competition, but we are considering the express terms of a statute. In Sec. 1 of the trademark act, we find that registration may be procured for a mark to be used on a "class of merchandise," and the applicant must name "the class of merchandise and the particular description of goods comprised in such class to which the trademark is appropriated." Section 5 forbids the registration of a mark the same as one known to be in use by another on "merchandise of the same descriptive properties," or which resembles closely the mark of another "appropriated to merchandise of the same descriptive properties." In sec. 16, one may render himself liable for damages for using a colorable imitation of the trademark of another on merchandise of "substantially the same descriptive properties." It will be observed that Congress used liberal terms in placing limitations upon the registration and use of similar trademarks. This is to protect the owner in a liberal use of his mark, but more particularly to protect the public from imposition arising from confusing goods of the same general class bearing the same or similar marks.

It is insisted by counsel for E. H. Taylor, Jr., & Sons that the proviso to sec. 5 of the trademark act is to protect rights already acquired at the time of the passage of the law. The mark in question being nontechnical, no right could have been asserted to it as a trademark; hence, Congress took no right away. So long as there was not a right to be devested, there was none to be reserved. Congress, by this act, was not preserving an existing right, but providing a method by which a right that did not exist before might be acquired. Hence, it was within its province to place any restriction upon those seeking its bene-

fits that it might deem proper. Since, therefore, E. H. Taylor, Jr., & Sons are here claiming a privilege, and not asserting a right, we think they come within the limitations of the statute.

The act of Congress of June 30, 1906, known as the "food and drugs act," was aimed at the suppression of the manufacture and sale of adulterated food and drugs, and also to prevent their misbranding. The classification of whisky and the proper branding of it under this act has been the source of considerable contention. Attorney General Bonaparte, in a decision interpreting this feature of the act (26 Ops. Atty. Gen. 216), said: "The definition of 'whisky' as a natural spirit involves as its corollary that there can be such a thing as 'imitation whisky.' If the same process were followed of which we spoke in connection with artificial wine, namely, if ethyl alcohol, either pure or mixed with distilled water, were given, by the addition of harmless coloring and flavoring substances, the appearance and flavor of whisky, it is impossible to find any other name for the product, in conformity with the pure-food law, then 'imitation whisky.'" The Attorney General properly held that "blend," "compound," and "imitation" whiskies are all entitled to the name of "whisky." They all belong to the one general class. They are "merchandise of the same descriptive properties." This view of the Attorney General is impliedly supported by a number of later decisions of the Federal courts. *Union Distilling Co.* v. *Bettmann* (not yet reported); *Woolner* v. *Rennick,* 170 Fed. 662; *Levy* v. *Uri,* supra.

In *E. H. Taylor, Jr., & Sons Co.* v. *Taylor,* 124 Ky. 173, 85 S. W. 1085, a suit between two of the parties to this interference, the court of appeals of Kentucky, considering the propriety of designating a mixture of whisky and ethyl alcohol as "a blend," to protect the public from being defrauded by confusing it with "straight" whisky, said: "The defendant may properly sell his brand of 'Old Kentucky Taylor,' provided he so frames his advertisements as to show that it is a blended whisky; but he cannot be allowed to impose upon the public a cheaper article, and thus deprive appellant of the fruits of his energy and expenditures by selling his blended whisky under labels or ad-

vertisements which conceal the true character of the article, for this would destroy the value of the appellant's trade." This defines what we conceive to be the purpose, both of the trademark act and the pure-food law,—to prevent unfair competition, and to protect the public from being imposed upon by designing manufacturers and traders.

We have held to a liberal interpretation of those clauses of the trademark act forbidding the registration of similar marks to be used on the same general class of merchandise. In the case of *Phœnix Paint & Varnish Co.* v. *John T. Lewis & Bros. Co.* 32 App. D. C. 285, we said: "We think two trademarks may be said to be appropriated to merchandise of the same descriptive properties in the sense meant by the statute when the general and essential characteristics of the goods are the same. The rule that the goods must be identical would defeat the purpose of the statute and destroy the value of trademarks. The test is whether there is such a sameness in the distinguishing characteristics of the goods as to be likely to mislead the general public."

The statute requires exclusive use, which we have held to be sole use. In *Worster Brewing Corp.* v. *Rueter & Co.* 30 App. D. C. 428, this court, considering the meaning of the word "exclusive," as used in sec. 5 of the trademark act, said: "Inasmuch as the word is used in the statute in connection with the words 'actual use,' and both expressions are used to qualify the special right conferred by this provision of the act, we hold that an actual use must be shown to have been possessed and enjoyed by the applicant, to the sole exclusion of all others. The use could not be exclusive if, during the period, it appears that another was using the same word as a trademark upon the same character of goods." We have adhered to this ruling in many decisions since rendered. It cannot be said that there has been sole use by E. H. Taylor, Jr., & Sons of the word "Taylor" as a trademark for whisky when the record discloses the use of this mark by at least three others during the ten years' period on goods of the same descriptive properties.

A nontechnical mark cannot be registered under this provi-

sion of the statute, when it is so similar to another mark in use during the same period as to cause confusion in trade. Assuming that Wright & Taylor are producing a whisky compound, and should advertise and mark it as such, and C. H. Graves & Sons are producing a whisky blend, and should advertise and mark it as such, they would doubtless have the right to use their respective marks without infringing the use of the mark of E. H. Taylor, Jr., & Sons. Can it be said that these three brands of whisky, though marked as above described, could come into the market, all bearing the "Taylor" mark, and not create confusion? This is inconceivable, and this is what the statute aims to prevent. They are all whiskies—"merchandise of the same descriptive properties"—produced and used for the same purpose. The difference is one of quality, and not of description. While it is, perhaps, unfortunate that one honestly complying with the law is compelled to suffer at the hands of commercial sharks, there is no relief afforded in this proceeding. It must be found in another forum.

The decision of the Commissioner of Patents is affirmed, and the clerk is directed to certify these proceedings, as by law required.                                      *Affirmed.*

Motions for rehearing in Nos. 576 and 579 were overruled October 22, 1909.

---

# GOMPERS *v.* BUCK'S STOVE & RANGE COMPANY.

CONTEMPT OF COURT; APPEALS; EQUITY; BILLS OF EXCEPTION; TEMPORARY INJUNCTION.

1. Criminal contempts of court consist in such disobedience of the mandates or decrees of the court as constitutes a defiance of the court's power and authority, and for which the guilty party is punishable by

fine or imprisonment; while civil contempts consist in the refusal of the parties to do something which they are ordered to do for the benefit and advantage of the opposing parties, and for which they stand committed until they comply with the court's order.

2. An order in an equity suit finding the defendants guilty of contempt of court for having disobeyed a previous restraining order will be considered as an interlocutory order, and reviewable on appeal as a part of the original cause, only where the contempt was a civil one; if it was a criminal contempt, the order will be deemed to have been made in a proceeding separate from the original cause; and it is immaterial that the alleged contempt was brought to the lower court's attention by petition of the complainant, and not by the prosecuting officer of the government.

3. Where, on a petition of the complainant in an equity suit, charging the defendants with specific acts of disobedience of a previous restraining order, and on the answers of the defendants to the petition, and testimony taken by the parties, the court makes an order finding the defendants guilty of contempt for having violated the restraining order, as charged, and sentences them to imprisonment therefor, an appeal from such order by the defendants will lie; but the contempt being a criminal, and not a civil, one, in the absence from the record on appeal of a bill of exceptions or its equivalent, the appellate court will consider only the pleadings and order itself, and will presume that the evidence was sufficient to support the finding of the court.

4. *Quære,* whether acts of disobedience by the defendants in an equity cause of a restraining order, committed between the signing of the order by the court and the filing by the complainant of the bond required by equity rule 42 of the lower court, constitute contempt of court.

5. Contempt of court may be committed by innuendo and insinuation, and may consist of maliciously saying or doing anything that will have a tendency of inducing others to disregard the authority of the court.

6. Where, in a suit for an injunction by a manufacturing company against a labor organization and its officers and members, the court made an order restraining the defendants *pendente lite* from prosecuting or aiding in the prosecution of a boycott against the complainant and its products, and from printing the complainant's name in the "We Don't Patronize" and "Unfair" list of the official publication of the organization, and subsequently, on petition of the complainant, made a further order finding certain of the defendants guilty of contempt of court for having circulated an edition of such publication, printed before the date of the restraining order, and containing the name of the complainant in such list, and also of having made various statements in public speeches and in editorials printed in

such publication, with intent to cause the members of the organization and their friends to disobey the injunction and continue the boycott, and which had that effect, it was *held*, on an appeal by the defendants, affirming the contempt order, that while such statements might not, if literally interpreted, constitute a technical contempt, yet, as the manifest intent of the defendants was not only to disobey the restraining order themselves, but also to inspire their followers to do likewise, their acts were to be regarded as contempt of court. (Mr. Chief Justice Shepard dissenting.)

7. Where a labor organization and its officers have been enjoined from aiding in a boycott against a manufacturing company and its products, and from printing the company's name in the "Unfair" list of the official publication of the organization, the act of one of such officers in presiding at and taking part in the deliberations of a labor convention at which a resolution was adopted placing the products of such manufacturer on the "Unfair" list, and fining any member who should purchase any such products, and providing for expulsion from the order for nonpayment of any such fine, is a violation of the injunction, and constitutes contempt of court.

8. Where the finding of the court below in a contempt proceeding, that the accused was guilty of certain acts which constitute contempt of court, is sufficient to support the sentence of imprisonment which the court imposed, and the penalty imposed is not greater than could have been inflicted had such acts constituted the only offenses charged, it is not necessary for the appellate court, on appeal from such finding, to consider other acts which the court below also found the accused was guilty of committing and which it held also to be contempt of court.

9. On an appeal from an order adjudging the defendants in an equity suit guilty of contempt of court for violating a previous restraining order pending an appeal therefrom, which restraining order, pending the appeal from the contempt order, was modified by this court in certain particulars, this court will not consider the question whether the restraining order was void or merely erroneous in the respects in which it was modified, where the lower court, in the contempt order, found the defendants also guilty of violating provisions of the restraining order which this court, on appeal, affirmed and approved.

10. The high character and distinguished position of the defendants in an equity suit who have been adjudged guilty of criminal contempt of court for disobeying a previous order restraining them from aiding in the prosecution of a boycott cannot properly be considered by this court as a reason for reversing the contempt order on an appeal therefrom. Such matters are for the consideration of the pardoning power.

No. 1990. Submitted April 20, 1909. Decided November 2, 1909.

HEARING on an appeal by the defendants from an order of the Supreme Court of the District of Columbia, adjudging them guilty of contempt of court for violation of a previous restraining order of that court, and sentencing them to imprisonment; and also on a motion by the appellee to dismiss such appeal.                                     *Order affirmed.*

The COURT in the opinion stated the facts as follows:

This cause was appealed from a decree of the supreme court of the District of Columbia adjudging appellants, Samuel Gompers, Frank Morrison, and John Mitchell, guilty of contempt of court. For convenience, appellants will be referred to hereafter as defendants, and appellee, The Buck's Stove & Range Company, as complainant.

On the 19th day of August, 1907, a bill of complaint was filed by the complainant corporation in the supreme court of the District of Columbia, praying for an order of injunction restraining certain parties, among whom were these defendants, from conducting a boycott against the business of complainant. On the 18th day of December, 1907, the temporary restraining order set forth in the petition herein, was entered.

The bond required by the court to be filed to indemnify the defendants against any damage they might sustain by reason of the order was filed by complainant on the 23d day of December, 1907. The temporary restraining order, therefore, did not become effective until that date. Thereafter, evidence was taken by the respective parties, and, on hearing, the court, on March 23, 1908, entered a decree making the temporary injunction perpetual as to the original defendants.

From the final decree making the temporary injunction perpetual, an appeal was taken to this court. No supersedeas bond was given nor any action taken by the defendants to stay the judgment. On hearing, this court (33 App. D. C. 83) modified the decree to read as follows:

"This cause came on to be heard on the transcript of the

record from the supreme court of the District of Columbia, and was argued by counsel.

"On consideration whereof, it is now here ordered, adjudged, and decreed by this court that the decree of the said supreme court in this cause be, and the same is hereby, modified and affirmed as follows: It is adjudged, ordered, and decreed that the defendants, Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, individually and as representatives of the American Federation of Labor, their and each of their agents, servants, and confederates, be, and they hereby are, perpetually restrained and enjoined from conspiring or combining to boycott the business or product of complainant, and from threatening or declaring any boycott against said business or product, and from abetting, aiding, or assisting in any such boycott, and from directly or indirectly threatening, coercing, or intimidating any person or persons whomsoever, from buying, selling or otherwise dealing in complainant's product, and from printing the complainant, its business or product, in the 'We Don't Patronize' or 'Unfair' list of defendants in furtherance of any boycott against complainant's business or product, and from referring, either in print or otherwise, to complainant, its business or product, as in said 'We Don't Patronize' or 'Unfair' list in furtherance of any such boycott."

This cause arose out of the alleged disobedience by these defendants of the decree of the court below. On July 20, 1908, complainant filed a petition in the original cause in equity, charging the defendants Samuel Gompers, Frank Morrison, and John Mitchell with wilful and premeditated violations of both the temporary and perpetual injunctions, and with a total disregard of the same, and, in so doing, they are charged with

acting in gross and wilful contempt, of the authority of the court.   The petition in full appears in the margin.*

On the same day the petition in the present case was filed, a citation was issued requiring the defendants, on or before the 8th day of September, 1908, to appear and show cause why they should not be adjudged in contempt of the order and decree of the court.   Within the time allowed, the defendants appeared

---

*Petition.

In the Supreme Court of the District of Columbia.

No. 27305.   Equity.

THE BUCK'S STOVE & RANGE COMPANY, Plaintiff,
*vs.*
THE AMERICAN FEDERATION OF LABOR ET AL., Defendants.

The petition of the Buck's Stove & Range Company respectfully shows to the court as follows:

I.

It is a body corporate, organized and existing under the laws of the State of Missouri.

II.

Heretofore, to wit: the 19th day of August, A. D. 1907, your petitioner filed in this cause its original bill of complaint, naming as defendants, among others, Samuel Gompers, Frank Morrison, and John Mitchell, who duly answered the bill and afterwards filed an amended answer to the same, both the said answer and the amended answer being made jointly by them and their codefendants.

This cause came on to hearing on an application for a temporary injunction, and thereafter, to wit; the 18th day of December, A. D. 1907, after full hearing, the court, upon consideration of the said application for an injunction *pendente lite,* and of the evidence submitted with respect thereto, passed and entered in this cause its order enjoining and restraining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, from interfering with the plaintiff in the conduct of its business, the said order being in terms as follows:

This cause coming on to be heard upon the petition of the complainant for an injunction *pendente lite* as prayed in the bill, and the defendants' re-

and answered separately, substantially admitting the facts al-
leged in the petition in so far as they directly applied to them
individually or collectively; but each specifically denying any
intention to disregard or treat with contempt the decrees of
the court.   As we shall later observe, the answers, in the state
of this record, become of little importance in the disposition of
this appeal.

A voluminous amount of evidence was taken by the respec-

turn to the rule to show cause issued upon the said petition, having been
argued by the solicitors for the respective parties, and duly considered, it is
thereupon by the court, this 18th day of December, A. D. 1907, ordered that
the defendants, the American Federation of Labor, Samuel Gompers, Frank
Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Con-
nell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Jos-
eph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C.
Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman,
their and each of their agents, servants, attorneys, confederates, and any and
all persons acting in aid of or in conjunction with them or any of them,
be, and they hereby are, restrained and enjoined until the final decree in
said cause from conspiring, agreeing, or combining in any manner to re-
strain, obstruct, or destroy the business of the complainant, or to prevent
the complainant from carrying on the same without interference from them
or any of them, and from interfering in any manner with the sale of the
product of the complainant's factory or business by defendants, or by any
other person, firm, or corporation, and from declaring or threatening any
boycott against the complainant, or its business, or the product of its fac-
tory, or against any person, firm, or corporation engaged in handling or
selling the said product, and from abetting, aiding, or assisting in any such
boycott, and from printing, issuing, publishing, or distributing through
the mails, or in any other manner, any copy or copies of the American
Federationist, or any other printed or written newspapers, magazine, cir-
cular, letter, or other document or instrument whatsoever, which shall con-
tain or in any manner refer to the name of the complainant, its business
or its product in the "We Don't Patronize," or the "Unfair" list of the de-
fendants, or any of them, their agents, servants, attorneys, confederates,
or other person or persons acting in aid of or in conjunction with them,
or which contains any reference to the complainant, its business or product,
in connection with the term "Unfair" or with the "We Don't Patronize"
list, or with any other phrase, word, or words of similar import, and from
publishing or otherwise circulating, whether in writing or orally, any state-
ment or notice, of any kind or character whatsoever, calling attention to

tive parties.   On hearing, the court entered the following decree:

"Now come the parties, by their attorneys, and the respondents, Samuel Gompers, Frank Morrison, and John Mitchell, in their proper persons, and this cause having been submitted to the court on, to wit, the 17th day of November, A. D. 1908, upon the petition of the complainant for a rule upon the respondents Samuel Gompers, Frank Morrison, and John Mitchell, to show

---

the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been declared to be "Unfair," or that it should not be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect or import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person, firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession, stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions, or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States or Territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation, to do or cause to be done any of the acts or things aforesaid.

And it is further ordered by the court that this order shall be in full force, obligatory and binding upon the said defendants and each of them, and their said officers, members, agents, servants, attorneys, confederates, and all persons acting in aid of or in conjunction with them, upon the service of a copy thereof upon them or their solicitors or solicitor of record in this cause; Provided, The complainant shall first execute and file in this cause, with a surety or sureties to be approved by the court or one of the justices thereof, an undertaking to make good to the defendants all damage by them suffered or sustained by reason of wrongfully and inequitably suing out this injunction, and stipulating that the damages may be ascertained in such manner as the justice of this court shall direct, and that, on dissolving the injunction, he may give judgment thereon against the

cause why they should not be adjudged in contempt, the answers of the said respondents, and the testimony taken thereunder, and after full argument by the solicitors of the parties, respectively, and the same having been duly considered by the court, it now finds the fact to be that, on or about the 24th day of January, 1908, while the injunction *pendente lite,* of December 18,

---

principal and sureties for said damages in the decree itself dissolving the injunction.

(Signed)                              Ashley M. Gould, *Justice.*

Thereafter, to wit: the 23d day of December, A. D. 1907, an undertaking, in manner and form as required in and by the said order, was entered into and given by the petitioner, and was filed in the cause and approved by the court, whereupon the said order restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, became operative, binding, and effective, of which the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, then and there had notice.

### III.

Thereafter evidence was taken on behalf of the plaintiff and of the defendants, and the cause duly came on for hearing upon the pleadings and the evidence, and, having been duly considered, a final decree was entered in this cause, to wit: the 23d day of March, A. D. 1908, perpetually restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, from conspiring, agreeing, or combining to restrain, obstruct, or destroy the business of the complainant, and from interfering in any manner with the sale of the product of the complainant's factory, and from doing other things, performing or committing other acts more fully set out in the said decree, which, in terms, is as follows:

In the Supreme Court of the District of Columbia.

No. 27305.   Equity.

THE BUCK'S STOVE & RANGE COMPANY:
*vs.*
THE AMERICAN FEDERATION OF LABOR ET AL.

Final Decree.

The above-entitled cause coming on at this time for final hearing, **and**

1907, was, and was by them known to be, in force, the said respondents published and caused to be widely disseminated a paper signed by them, and which they caused to be accompanied by another paper, therein referred to as an editorial from the February, 1908, Federationist, which papers, in violation of the express mandates of the said injunction, made reference to

---

having been submitted to the court by the respective parties, through their solicitors, upon the pleadings and the evidence, and having been duly considered, it is thereupon by the court this 23d day of March, A. D. 1908, adjudged, ordered, and decreed that the defendants, the American Federation of Labor, Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, their and each of their agents, servants, attorneys, confederates, and any and all persons acting in aid of or in conjunction with them or any of them, be, and they hereby are, perpetually restrained and enjoined from conspiring, agreeing, or combining in any manner to restrain, obstruct, or destroy the business of the complainant, or to prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory or business by defendants, or by any other person, firm, or corporation, and from declaring or threatening any boycott against the complainant or its business, or the product of its factory, or against any person, firm, or corporation engaged in handling or selling the said product, and from abetting, aiding, or assisting in any such boycott, and from printing, issuing, publishing, or distributing through the mails, or in any other manner, any copies or copy of the American Federationist, or any other printed or written newspaper, magazine, circular, letter, or other document or instrument whatsoever, which shall contain or in any manner refer to the name of the complainant, its business or its product in the "We Don't Patronize" or the "Unfair" list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them, or which contains any reference to the complainant, its business or product, in connection with the term "Unfair" or with the "We Don't Patronize" list, or with any other phrase, word, or words of similar import, and from publishing or otherwise circulating, whether in writing or orally, any statement or notice, of any kind or character whatsoever, calling attention to the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been declared to be "Unfair," or that it should not

the fact that a boycott had been declared against the complainant, its business and its product, and that organized labor had asked its friends to use their influence and purchasing power in aid thereof, alleged that the said injunction was an invasion of the liberty of the press and of free speech, and declared that it could not 'compel union men or their friends to buy the Buck's stoves and ranges,' and that 'for this reason, the injunction will fail to bolster up the business of this firm, which it claims is so swiftly declining;' that, on or about the 25th day of January,

---

be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect and import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person, firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession, stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions, or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining, the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States and Territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation, to do or cause to be done any of the acts or things aforesaid.

And it is further adjudged, ordered, and decreed that the complainant recover against the defendants the cost of this suit, to be taxed by the clerk, and that it have execution therefor as at law.

(Signed)                              Harry M. Clabaugh,
                                           ' Chief Justice

---

## IV.

And upon the entering of the said final decree, the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, noted an appeal therefrom to the court of appeals of the District of Columbia, and perfected the said appeal by filing a bond for costs, which was duly approved by the court, but did not file a supersedeas bond or in any manner supersede or stay the said decree, and it is still in full force and effect, and binding

1908, the respondent John Mitchell, in like violation of the said boycott, combined with sundry persons, acting in aid of and in conjunction with himself and others of the defendants, in calling attention to the said boycott, and in giving notice that anyone of the 300,000 members of the United Mine Workers of America who should purchase a stove of the complainant's manufacture should be fined therefor and expelled from the said organization if the fine were not paid; that in April, 1908, when the permanent injunction of March 23d, 1908, was, and

---

upon the said defendants and each of them, the said Samuel Gompers, Frank Morrison, and John Mitchell, included.

### V.

Reference is hereby made to the original bill and exhibits filed in support of the same, the answer and amended answer of the defendants, the testimony taken on both sides, the original order restraining and enjoining the defendants *pendente lite,* and the final decree in the cause, and each and every other paper and proceeding in this cause, from the institution of the suit to the filing of this petition; and it is prayed that the same may be taken and read as a part hereof at any and all hearings upon this petition, whether in this court or upon appeal from its decision herein rendered.

### VI.

Notwithstanding the said order restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, passed by the court on the 18th day of December, A. D. 1907, and notwithstanding the final decree in the cause, passed on the 23d day of March, A. D. 1908, perpetually restraining and enjoining the defendants, the said Samuel Gompers, Frank Morrison, and John Mitchell, included, all as above set out, the said Samuel Gompers, Frank Morrison, and John Mitchell have, since the filing of the said bill and the passage and entry of the said order, as well as of the final decree, frequently, regularly, and systematically, wilfully and with premeditation, violated the said order and the said final decree alike, and have totally disregarded the same; and, in so doing, they have acted in gross and wilful contempt of the authority of the court and its order and action in the premises, as hereinafter set out; the said Samuel Gompers having, some ten years ago, suggested the course of conduct which has been pursued in this case by him and by the said Frank Morrison and John Mitchell, and all of them having since repeated that suggestion.

was by them known to be, in full force, the respondents Samuel Gompers and Frank Morrison, in violation thereof, published in the said American Federationist, and widely disseminated, a letter, signed by them and addressed to the numerous state branches and central bodies of the defendant the American Federation of Labor, requesting them to 'bear in mind that an in-

## VII.

Heretofore, to wit: the 13th day of December, A. D. 1897, at the convention of the defendant American Federation of Labor, held at Nashville, Tennessee, the said Samuel Gompers, being then, as now, the president of the said defendant American Federation of Labor, in reporting, as its president, to the convention of the said defendant, used the following language, to be found at pages 23 and 24 of the official report of the proceedings of the American Federation of Labor for the year 1897, which were prepared, authenticated, and circulated by the said Frank Morrison, he being then, as now, Secretary of the defendant American Federation of Labor, and which were published by order of the said convention, and, by like order, republished by the said Frank Morrison in or about the year 1905:

### Boycotts and Court Decisions.

Recently one of the branches of the Federal courts decided by a majority vote that the boycott is illegal. Whether the decision rendered is applicable to all cases or simply to the one immediately under consideration has not yet fully transpired. It is manifest that the workers should have the same right which other citizens enjoy, the right which neither constitutions grant nor courts can deny,—the right to stand by our friends, patronize our sympathizers and co-operators, and to withhold our patronage from those who are antagonistic to us and our cause; and the further right to acquaint our people with our preferences. While there is no desire here to argue in favor of our rights, we should demand the change of any law which curbs the privilege and the right of the workers to exercise their normal and natural preferences. In the meantime, we should proceed as we have of old, and wherever a court shall issue an injunction restraining any of our fellow workers from placing a concern hostile to labor's interest on our unfair list, enjoining the workers from issuing notices of this character, the further suggestion is made that, upon any letter or circular issued upon a matter of this character, after stating the name of the unfair firm and the grievance complained of, the words, "We have been enjoined by the courts from boycotting this concern," could be added with advantage.

And the conduct and acts of the said Samuel Gompers hereinafter set

junction issued by a court in no way compels labor or labor's friends to buy the product of the Van Cleave Buck's Stove & Range Company of St. Louis. Fellow workers, be true and helpful to yourselves and to each other. Remember that united effort in the cause of right and justice must triumph;' and the court further finds as a fact that the respondents Samuel Gom-

out have been designed and carried out in accordance with the scheme or plan so outlined by him at the convention of the defendant American Federation of Labor, held at Nashville in December, 1897.

### VIII.

And, when on the stand as a witness for the defendants in this cause, on January 30, 1908, the attention of the said Samuel Gompers, on cross-examination, was called to the portion of his report to the Nashville, 1897, convention, set out in the last paragraph of this petition, and he was thereupon interrogated, and replied in respect to the same, as follows:

*Q.* Have you ever recalled that suggestion?

*A.* No, sir; I would rather reaffirm it.

*Q.* You would reaffirm it?

*A.* It is a very long quotation, and my answer requires some little amplification of it, so that I may be fully understood.

*Q.* This is the particular part to which I desire to direct your attention. (reading):

"In the meantime we should proceed as we have of old, and wherever a court shall issue an injunction restraining any of our fellow workers from placing a concern hostile to labor's interest on our unfair list, enjoining the workers from issuing notices of this character, the further suggestion is made that, upon any letter or circular issued upon a matter of this character, after stating the name of the unfair firm and the grievance complained of, the words, 'We have been enjoined by the courts from boycotting this concern, could be added with advantage."

You have stated that you have never recalled that?

*A.* No, sir; I have never recalled it, and I think—you can imagine that, in a report, the whole subject cannot be comprehended.

*Q.* You can explain it later. You have answered it sufficiently. We want to get along.

*A.* Just let me make a memorandum, then, so that I will not forget it.

And on redirect examination, he was asked the following question and made the following answer:

*Q.* In asking you about the report of 1897, Mr. Davenport said you made reference to a decision then which enjoined boycotts, and which, in your report, you said whether it was general or not, you could not determine, etc., and then you requested to be permitted at that time to go on and say some-

pers, Frank Morrison, and John Mitchell are guilty of the several acts charged in paragraphs 17 and 26 of the complainant's petition, that the said respondents Gompers and Morrison are guilty of the several acts charged in the 16th and 20th paragraphs of the said petition, that the respondent Morrison is guilty of the acts charged in the 25th paragraph of the said peti-

---

thing further; but you were not allowed to do so. Is there anything now that you care to say about that report?

*A.* I suggested to the organizations of labor that they make the statement that they had been enjoined, if an injunction had been issued, by a court,— a single statement of fact.

### IX.

Thereafter, in the November, 1902, number of the American Federationist, of which the said Samuel Gompers was then, as he now is, its duly authorized editor, in the editorial column thereof, under the name of the said Samuel Gompers, at page 808, he printed and published the following:

"We beg to say plainly and distinctly to Mr. Merritt and fellow sympathizers that the American Federation of Labor will never abandon the boycott, and that the threats against the Federation are idle, impotent, and impudent."

The said American Federationist, as set out in paragraph 4 of the original bill in this cause, is the official organ of the said defendant, American Federation of Labor, and has a wide circulation, not only among the members of the said Federation, but among the public generally.

### X.

The original bill in this cause having been filed on to wit: the 19th day of August, A. D. 1907, and the process of subpœna having been served upon the said Samuel Gompers, as a defendant named in the bill on to wit: the 20th day of August, A. D. 1907, thereafter, to wit; on the same day, or the day following, the said Samuel Gompers not only stated his intention of not complying with any order which might be passed by the court pursuant to the prayers of the said bill, but publicly stated such intention in an interview with the representatives of three prominent newspapers, and the said interview was extensively published throughout the country, including the city of Washington, in the District of Columbia. In the course of said interview so published, the said Samuel Gompers said: "When it comes to a choice between surrendering my rights as a free American citizen or violating the injunction of the courts, I do not hesitate to say that I shall exercise my rights, as between the two." This statement of the said Samuel

tion, and that the respondent Gompers is guilty of the several acts charged in the 19th, 21st, 22d, and 23d paragraphs thereof.

"And, the court being fully advised in the premises, it is by it, this 23d day of December, A. D. 1908, considered that the said respondents Samuel Gompers, Frank Morrison, and John Mitchell are guilty of contempt in their said disobedience of

---

Gompers, at or about the time of the filing of the bill in this cause, was made in accordance with, and pursuant to, the suggestion and purpose outlined by him at the Nashville convention above mentioned, ten years earlier.

### XI.

Thereafter, to wit: on the 5th day of September, A. D. 1907, the said Samuel Gompers, at the Jamestown Exposition, in the course of his Labor Day speech, delivered as a public address, said:

"An injunction is now being sought from the supreme court of the District of Columbia against myself and my colleagues of the executive council of the American Federation of Labor. It seeks to enjoin us from doing perfectly lawful acts; to deprive us of our lawful and constitutional rights. So far as I am concerned, let me say that never have I, nor ever will I, violate a law. I desire it to be clearly understood that when any court undertakes without warrant of law, by the injunction process, to deprive me of my personal rights and my personal liberty guaranteed by the Constitution, I shall have no hesitancy in asserting and exercising those rights."

This language of the said Samuel Gompers was published broadly and generally in the daily press throughout the country, as he knew it would be. Not only so, but in the October, 1907, number of the American Federationist, he published the same at length in the editorial column of the said publication, under his own name, at page 789 thereof. And the said Samuel Gompers has, on numerous occasions since then, repeated and reaffirmed his said threats to violate any injunctive process of the court in this case which should be issued, and which has been issued, and is now in force, against him, and has carried out his said threats by persistently violating the said injunctive process.

### XII.

In the same October, 1907, number of the American Federationist, at page 785, in the editorial column thereof, under his own name, after reciting on the preceding page the filing of the original bill in this cause and the institution of the present suit, the said Samuel Gompers used the following language, referring directly and specifically to this cause:

"So long as the right of free speech and free press obtains, we shall pub-

the plain mandates of the said injunctions; and it is, therefore, ordered and adjudged that the said respondent Frank Morrison be confined and imprisoned in the United States jail in the District of Columbia, for and during a period of six months; that the said respondent John Mitchell be confined and imprisoned in the said jail for and during a period of nine months; and that the respondent Samuel Gompers be confined and imprisoned in the said jail for and during a period of twelve months; said imprisonment as to each of said respondents to take effect from and including the date of the arrival of said respective respondents at said jail."

From this judgment the case comes here on appeal.

---

lish the truth in regard to all matters. If any person or association challenges the accuracy of any of our statements, we are willing to meet him or them in the courts and defend ourselves. So long as we do not print anything which is libelous or seditious, we propose to maintain our rights and exercise liberty of speech and liberty of the press. If, for any reason, at any time, the name of the Buck's Stove & Range Company does not appear upon the 'We Don't Patronize' list of the American Federationist (unless that company becomes fair in its dealings toward Labor), all will understand that the right of free speech and free press are denied us; but even this will not deprive us, or our fellow workmen and those who sympathize with our cause, from exercising their lawful right and privilege of withholding their patronage from the Van Cleave Company— the Buck's Stove & Range Company of St. Louis.

"So far as we are personally and officially concerned, we have fully stated our position in the American Federationist and elsewhere.

"Do not fail to keep the Buck's Stove & Range Company of St. Louis in mind, and remember that it is on the unfair list of organized labor of America."

XIII.

And in the same October, 1907, number of the American Federationist, at pages 791 and 792 thereof, in the column headed "Editorial Notes," the said Samuel Gompers, referring to this cause, used the following language:

"So labor must not use its patronage as it will,—that is, if Van Cleave of Buck's Stove & Range Company fame has his way. But what vested right has that company in the patronage of labor or of labor's friends? It is their own to withhold or bestow as their interest or fancy may direct.

*Mr. Alton B. Parker, Mr. Jackson H. Ralston, Mr. Frederick L. Siddons,* and *Mr. William E. Richardson,* for the appellants:

## On the motion to dismiss.

It is not to be denied that where an order punishing a contempt of a court's decree, judgment, or order is inflicted on a person not a party to the suit in which the alleged violated decree or judgment was entered, or where the contempt proceedings have for their primary object punishment for violations of valid decrees or judgments, there are decisions of Federal courts which require that a review of the order inflicting the

---

"They have a lawful right to do as they wish, all the Van Cleaves, all the injunctions, all the fool or vicious opponents to the contrary notwithstanding.

"Wonder whether Van Cleave will try for an injunction compelling union men and their friends to buy the Buck's Stove & Range Company's unfair product?

"Until a law is passed making it compulsory upon labor men to buy Van Cleave's stoves we need not buy them, we won't buy them, and we will persuade other fair-minded, sympathetic friends to co-operate with us and leave the blamed thing alone.

"Go to —— with your injunctions."

And, under the same heading, he published the following additional statement:

"The Buck's Stove & Range Company of St. Louis (of which Mr. Van Cleave is president) will continue to be regarded and treated as unfair until it comes to an honorable agreement with organized labor. And this, too, whether or not it appears on the 'We Don't Patronize' list."

Pursuant to said declarations and threats of the said Samuel Gompers, the name of petitioner has been retained and published in the "Unfair" list in the journal of the International Metal Polishers Union, described in the original bill in this cause, to wit: in its issues of November and December, 1907, and January, February, March, April, May, June, and July, 1908, as will be seen by reference to the said issues, herewith filed as exhibit petitioner No. 4.

### XIV.

Thereafter, on to wit: the 14th day of November, A. D. 1907, the application for an injunction *pendente lite* came on for hearing before the court.

punishment must be through the instrumentality of a bill of exceptions, an agreed case, or the like, as in the case of a review of a judgment entered in an action at law. But the authority of these decisions has no application to a case like that presented in the proceeding at bar. This appears, from the language of the court in *Bessette* v. *Conkey Co.* 194 U. S.

---

and the hearing of the same occupied several days, at the conclusion of which the cause was taken under consideration by the presiding justice. After the cause had been submitted to the court, and before its decision in the premises had been rendered, the said Samuel Gompers and Frank Morrison, in anticipation of the granting of said application, and for the purpose of nullifying and defeating the effect of any injunction which should be issued in the premises, prepared, published, and distributed a circular letter, signed by the said Samuel Gompers and Frank Morrison, copies of which were by them transmitted and caused to be transmitted to the various unions affiliated with the American Federation of Labor in the several States and Territories of the United States and Canada, on or about its date, November 26, 1907, to the number of twenty-seven thousand, as will be seen by reference to the stipulation of counsel for the respective parties, filed in this cause on to wit: the 8th day of April, A D. 1908. The said circular letter is, in part, as follows:

Mr. Van Cleave, for the Buck's Stove & Range Company, brought suit against the American Federation of Labor and its executive council, and has petitioned the court for an injunction to prohibit the American Federation of Labor from in any way advising organized labor and its friends of the fact that the Buck's Stove & Range Company is unfair to its employees, and for that reason its name is published upon the American Federation of Labor "We Don't Patronize" list.

The court will soon give a decision on the legal issue which has been raised. We shall continue to maintain that we have the right to publish the name of the Buck's Stove & Range Company upon the "We Don't Patronize" list. Should we be enjoined by the court from doing so, the merits of the case will not be altered, nor can any court decision take from any man the right to bestow his patronage where he pleases.

The said letter, so prepared, issued, and caused to be circulated by the said Samuel Gompers and Frank Morrison, further stated:

Bear in mind that you have a right to decide how your money shall be expended.

324, quoting with approval the language of Judge Sanborn, of the court of appeals for the eighth circuit, in *Re Nevitt,* 117 Fed. 448.

The distinction drawn between the different kinds of contempt proceedings in these cases is determinative of the motion to dismiss. The order punishing for contempt in this case was

---

You may or may not buy the products of the Buck's Stove & Range Company.

There is no law or edict of court that can compel you to buy a Buck's stove or range.

You cannot be prohibited from informing your friends and sympathizers of the reason why you exercise this right. You have also the right to inform business men handling the Buck's Stove & Range Company's products of its unfair attitude toward its employees, and ask them to give their sympathy and aid in influencing the Buck's Stove & Range Company to deal fairly with its employees and come to an honorable agreement with the union primarily at interest.

It would be well for you as central bodies, local unions, and individual members of organized labor and sympathizers, to call on business men in your respective localities, urge their sympathetic co-operation, and ask them to write to the Buck's Stove & Range Company of St. Louis, urging it to make an honorable adjustment of its relations with organized labor.

Act energetically and at once. Report the result of your effort to the undersigned.

Sam'l Gompers,
President American Federation of Labor.
Frank Morrison,
Secretary.

XV.

And thereafter, to wit: the 17th day of December, A. D. 1907, the court filed its opinion in the cause, to the effect that the complainant was entitled to the injunction *pendente lite* as prayed in the original bill, and on to wit: the 18th day of December, A. D. 1907, passed the order set out in paragraph 2 of this petition. The said order became operative and effective by the giving of the undertaking required by it on to wit: the 23d day of December, A. D. 1907, and has never been revoked or altered. Notwithstanding the passage and entry of this order, and the taking effect of the same by the giving of the undertaking, as aforesaid, the said Samuel Gompers and Frank Morrison, having set in motion the instrumentalities devised by them for the obstruction and nullification of the order when en-

essentially remedial in its character.   It was made to enforce obedience to the injunction, which was the prime object of the bill of complaint filed by the petitioner, and the proceedings leading to the order inflicting the punishment were initiated by the petitioner and original complainant, it complaining, in substance, that the relief it had sought and which had been granted

---

tered, have failed to take any action whatever.to prevent that result, but, on the contrary, have since taken other steps, as will hereafter appear, for the more effectual carrying out of the plan and purpose outlined in said circular letter.

## XVI.

The order for an injunction *pendente lite* having been passed on the 18th day of December, A. D. 1907, and the injunction having taken effect and become operative on the 23d day of December, A. D. 1907, as above stated, the said Samuel Gompers, as will be seen by reference to his deposition in this cause, hastened or "rushed" the publication of the January, 1908, issue of the American Federationist, with a view to circulating the same during the time which should elapse between the passage of the said order for an injunction, and the injunctive order itself.   The said January, 1908, number, at page 51, includes and publishes in full the "We Don't Patronize" or "Unfair" list of the American Federation of Labor, containing the name of petitioner; and at page 38 of the said issue, the said Samuel Gompers published the following:

"A limited number of the American Federationist for 1907, bound in two volumes, may be had on application to this office.   The 1907 volumes are bound in the same style as the preceding years.

"The official printed proceedings of the Norfolk convention of the A. F. of L. are now ready and can be had upon application by mail, 25 cents per single copy, $20 per hundred.   Postage prepaid by the A. F. of L."

The said proceedings of the Norfolk convention contain, at page 91, the name of petitioner as being on the "Unfair" list of the American Federation of Labor.

Notwithstanding the fact that the injunction *pendente lite* had taken effect on the 23d day of December, A. D. 1907, the said Samuel Gompers and the said Frank Morrison thereafter continued to circulate and distribute the said issue, containing the name of petitioner as aforesaid, and notwithstanding the fact that the permanent injunction has since been entered in this cause, they have, from the said 23d day of December, A. D. 1907, to the present time, continued, uninterruptedly, to circulate and distribute to the public generally copies of the said January, 1908, number

to it was being rendered of no avail to it by reason of the alleged wilful violations of the injunction order and decree by the appellants. It appealed to the equity court, which had passed the injunction order and decree, to give effect to them by compelling, through the coercive process of contempt proceedings, obedience to the order and decree. If this be the true character

of the American Federationist, of the proceedings of the Norfolk convention above mentioned, and bound copies of the American Federationist for the year 1907, the latter containing, in each of the May, June, July, August, September, October, November, and December numbers thereof, the name of petitioner on the "We Don't Patronize" or "Unfair" list of the American Federation of Labor; all in violation and wilful disregard and contempt of the injunctive order and decree of the court in this cause.

### XVII.

Thereafter, to wit: in the February, 1908, number of the American Federationist, the said Samuel Gompers, in the editorial column thereof, under his own name, published a lengthy article concerning the said order, at pages 98 to 105, inclusive, and the said Samuel Gompers, Frank Morrison, and John Mitchell published, at pages 112 and 113 of the said number of the American Federationist, what they denominated an "Urgent Appeal," signed by the defendant Samuel Gompers, as president, the defendant Frank Morrison, as secretary, and the defendants James Duncan, John Mitchell, James O'Connell, Max Morris, D. A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, as vice presidents, and the defendant John B. Lennon, as treasurer, composing the executive council of the American Federation of Labor, in which they made special reference to said editorial article as containing a full presentation of the said defendants' position in regard to said order of injunction. In the course of both the said editorial and the said "Urgent Appeal," it was stated that the order is an invasion of the liberty of the press and the right of free speech, and further stated in said editorial that, "with all due respect to the court, it is impossible for us to see how we can comply with all the terms of this injunction," and further stated in said editorial as follows:

"This injunction cannot compel union men or their friends to buy the Buck's stoves and ranges. For this reason, the injunction will fail to bolster up the business of this firm, which it claims is so swiftly declining.

"Individuals, as members of organized labor, will still exercise the right to buy or not to buy the Buck's stoves and ranges. It is an exem-

of the contempt proceedings, they were merely a part of the relief sought in an equity cause, and the order and judgment inflicting the punishment for contempt being final, it will be reviewed in this court, as any other final decree in equity, by an appeal taken in the ordinary way, and this means bringing up the whole record upon which the decree or order appealed from is based, which, in this case, is the petition for the rule to show

---

plification of the saying that 'you can lead a horse to water, but you can't make him drink;' and more than likely these men of organized labor and their friends will continue to exercise their right to purchase or not purchase the Buck's stoves and ranges.

"It may not be amiss here to say that, in all these proceedings, whether before the court or in the contest forced upon labor by the Buck's Stove & Range Company, no element of personal malice or ill-will enters. Labor is earnestly desirous of entering into friendly relations with employers, and this is none the less true of its desire to reach an honorable adjustment and agreement with the Buck's Stove & Range Company. So long, however, as that company continues in its hostile attitude to labor, denying it the right to organize, discriminates against union members, and refuses to accord conditions of employment generally regarded as fair in the trade, it must expect retaliatory measures; these measures always, however, within the law, and for the purpose of ultimately reaching an honorable, mutually advantageous agreement.

"The publication of the Buck's Stove & Range Company on the 'We Don't Patronize' list of the American Federation of Labor is only an incident in the history of the case. These stoves might have been left severely alone by purchasers if they had never been mentioned on that list. It is not the matter of removing that firm from the list against which we primarily protest, it is this injunction invading the freedom of the press."

And, at pages 114 and 115 of the said February, 1908, number of the American Federationist, the said Samuel Gompers published the order itself at length, prefacing the same with the following statement:

"In the official organ of the National Association of Manufacturers, one of the counsel for the Buck's Stove & Range Company declares that punishment for violation of the injunction issued by Justice Gould against the American Federation of Labor applies particularly to those within the territorial limits of the District of Columbia, who violate the terms of the injunction. That those who violate the terms of the injunction in any other part of the country outside of the District of Columbia can be punished only when they thereafter come within the territorial limits

cause why an attachment for contempt should not issue, and for general relief, the answers thereto, the evidence taken by the petitioner in support of the allegations of its petition, the opinion of the court, and its order and decree thereon.   It requires no bill of exceptions, agreed case, or the equivalent.

The petitioner, in its motion to dismiss, realizes that it must make it appear that the contempt proceeding is a common-law

---

of the District of Columbia.   Counsel for the American Federation of Labor assure us that this construction of the court's order is accurate."

Petitioner is advised and believes, and therefore avers, that the said statement prefacing the publication of the order of December 18, 1907, is an incorrect interpretation of the effect of the said order, and was made for the purpose of defeating, and of inducing others to violate, the same; and that the publication of the said order, prefaced as aforesaid, and of the said editorial, constituted a violation of the injunction *pendente lite* and a contempt of the order of the court.   A copy of the said February, 1908, number of the American Federationist is herewith filed, marked exhibit petitioner No. 1, and it is prayed that the said editorial, the said "Urgent Appeal," and the references on pages 114 and 115 thereof to the said order, be taken and read as a part of this petition.

### XVIII.

The said John Mitchell, as set out in paragraph 4 of the original bill in this cause, is a vice president and a member of the executive council of the defendant American Federation of Labor.   Until the 1st day of April, A. D. 1908, and for many years prior thereto, he was also the president of the United Mine Workers of America, one of the subordinate national and international unions of the defendant American Federation of Labor, referred to in paragraph 4 of the original bill in this cause, and in exhibit C, thereto attached, and the chairman of its executive board, by which executive board is published weekly the United Mine Workers' Journal, the official organ of the said United Mine Workers of America.   In the issue of the said United Mine Workers' Journal of January 30, 1908, the said John Mitchell caused or permitted to be published the above-mentioned editorial "Urgent Appeal" and statement prefacing the said injunction order, as published in the February, 1908, number of the American Federationist, as will be seen by reference to pages 6, 15, and 16 of the said issue of January 30, 1908, a copy of which is herewith filed, marked exhibit petitioner No. 2, and prayed to be taken and read as a part of this petition.   The said United Mine Workers of America comprise several hundred thousand members, and its official

proceeding, and that therefore the order or decree of the court below adjudging the appellants in contempt is reviewable by writ of error only, and not by appeal, this being the first stated cause of its motion to dismiss, although later in the petitioner's brief it is said that "it is, of course, not contended that an actual writ of error is necessary to bring a law cause from the lower

---

organ is circulated generally among the members of the said association, and the public at large.

On to wit: the 25th day of January, A. D. 1908, at the Nineteenth Annual Convention of the United Mine Workers of America, held at Indianapolis, Indiana, the defendant John Mitchell, its president, being in the chair, the following resolution was laid before the convention by the said defendant John Mitchell, put to a vote, and adopted unanimously, and by him so declared:

### Resolution No. 73.

Whereas, the Buck's Stove & Range Company, of St. Louis, Missouri, have taken legal steps to prevent organized labor in general, and the officers and executive committee of the A. F. of L., in particular, from advertising the above-named firm as being on the "Unfair" or "We Don't Patronize" list, and

Whereas, by the issue of such an injunction. or restraining order, as prayed for by above named firm, organized labor will be deprived of one of its most effective weapons, and

Whereas, J. W. Van Cleave, the president of above-named firm, also president of the National Manufacturers' Association, stated that, in a few years' time, he would disrupt organized labor; therefore, be it

Resolved that the U. M. W. of A., in Nineteenth Annual Convention assembled, place the Buck's stoves and ranges on the unfair list, and any member of the U. M. W. of A. purchasing a stove of above make be fined $5, and, failing to pay the same, be expelled from the organization.

And, thereafter, to wit: the 30th day of January, A. D. 1908, the said John Mitchell caused or permitted the official report of the proceedings of the said convention to be published in the above-mentioned issue of the said United Mine Workers' Journal, including the said resolution and the action taken thereupon, as will be seen by reference to page 7 of exhibit petitioner No. 2, above referred to.

And the said John Mitchell also caused or permitted the following to be published on the front page of the issue of the said United Mine Workers' Journal of the 9th day of January, A. D. 1908, as will be seen

court to this court for review." We have endeavored to show that this is a mistaken application of the rule in certain classes of contempt proceedings, which are treated as proceedings at common law, and, if we have succeeded in doing this, it seems to us that it settles the question raised by the motion, and the same must be overruled.

---

by reference to a copy of said issue herewith filed, marked exhibit petitioner No. 3, and prayed to be taken and read as a part of this petition:

### Unlawful Boycott.

Our readers should govern themselves accordingly and allow all to live unmolested.

Here is something clever and cute from the Galesburg Labor News:

"Whether or not the Manufacturers' Association, who were behind the Buck Stove & Range Company in instigating the suit, will accomplish their desired results, is difficult to say. Trades unionists will fail to see wherein they will. For no power on earth can compel a man to buy something he does not want to, and an announcement something on this order is enough to indicate to a union man what not to buy:

"It is unlawful for the American Federation of Labor to Boycott Buck Stoves and Ranges.

"Justice Gould, in the equity court of the District of Columbia, on December 17th, handed down a decision granting the company a temporary injunction preventing the Federation from publishing this firm as

### Unfair to Organized Labor.

"The above could hardly be construed to conflict with the law, since it is a statement of facts."

A funny thing about this case is that the boycott has been on this firm for more than a year. Now, the unions have their attention directed to it for fair.

And the peculiar arrangement of type in the said article, whereby particular display is given to the words "Boycott Buck Stoves and Ranges" and "Unfair to Organized Labor," without making these direct statements in the context of the article published, was devised and designed for the express purpose of violating the injunction of this court, whereby the publication of these statements is forbidden, and of causing the said publication to be reprinted and distributed and scattered broadcast throughout the land.

The said publication in the January 9, 1908, issue of the United Mine

It may be contended by the appellee that, in order to give
to a contempt proceeding the remedial character which we
insist characterizes the present contempt proceedings, it must
appear that the court below imposed a fine, payable in whole
or in part to the complainant and petitioner, as in the nature
of damages for injuries suffered by it by reason of the alleged

---

Workers' Journal was taken up and followed by the labor press, as it was
intended to be, and was extensively reprinted, and circulated broadly,
throughout the country, including the Cleveland Citizen, of Cleveland,
Ohio, published by the United Trades and Labor Council of that City,
in its issue of January 18, 1908; the Labor Journal, the official organ
of the New York Allied Printing Trades Council and of the Central
Trades and Labor Council, published at Rochester, New York, in its
issue of January 10, 1908; the St. Louis Labor, published at St. Louis,
Missouri, in its issue of January 18, 1908, and in its weekly issues from
then to the present time, and the Springfield Tradesman, published at
Springfield, Missouri, in its issue of January 18, 1908; all as will be
seen by reference to the deposition of the said Samuel Gompers, on file
and of record in this cause, and the exhibits herewith filed, to all of which
reference is hereby made.

### XIX.

Thereafter, to wit, in the March, 1908, number of the American Federa-
tionist, the said Samuel Gompers, in the editorial column thereof, at page
192, in pursuance of his plan to nullify the said order of the court in this
cause passed, to disregard and disobey the same, to injure and inter-
fere with the petitioner's business and the sale of its product by means
forbidden in the said order, and to induce the members of the American
Federation of Labor, and the public, not to patronize the petitioner, or
buy its product, and to keep the boycott against the petitioner constantly
in mind, and to maintain the same, though forbidden to do so by the said
order, published the following statement:

"It should be borne in mind that there is no law, aye, not even a court
decision, compelling union men or their friends of labor to buy a Buck's
stove or range. No, not even to buy a Loewe hat."

### XX.

And, for the like purpose, the said Samuel Gompers and the said Frank
Morrison published, in the April, 1908, number of the American Federa-
tionist, the statements hereafter referred to; the final decree in this cause
granting a permanent injunction against the defendants, the said Samuel

violations of the injunction order and decree. While some of the cases cited by the petitioner are cases in which fine, and not imprisonment, was the punishment inflicted, that fact by no means justifies the contention that may be urged by the petitioner in this connection. The supreme court of the District

---

Gompers and Frank Morrison included, having been entered on the 23d day of March, A. D. 1908, and prior to the publication of the said April, 1908, number.

In the editorial column thereof, under his own name, the said Samuel Gompers published, at page 279, the following:

"The temporary injunction issued by Justice Gould, of the court of equity, of the District of Columbia, in the (Van Cleave) Buck's Stove & Range Company of St. Louis against the American Federation of Labor, its officers and all others, has been made permanent. The case will now be carried to the court of appeals of the District of Columbia.

"It should be borne in mind that there is no law, aye, not even a court decision, compelling union men or their friends of labor to buy a Buck's stove or range. No, not even to buy a Loewe hat."

And in the official column of the said issue, at page 295, over their signatures, in an official letter addressed to state branches and central bodies, the said Samuel Gompers and Frank Morrison published the following statement:

"Bear in mind that an injunction issued by a court in no way compels labor or labor's friends to buy the product of the Van Cleave Buck's Stove & Range Company of St. Louis.

"Fellow workers, be true and helpful to yourselves and to each other. Remember that united effort in cause of right and just must triumph."

### XXI.

Thereafter, to wit, on the 19th day of April, A. D. 1908, in the course of a public address to a large gathering of working people in the city of New York, the said Samuel Gompers, for the like purpose, made the following statement:

"They tell us that we must not boycott. Well, if the boycott is illegal, we won't boycott. But I have no knowledge that any law has been passed or any order issued by any court compelling us to buy, for instance, a range or a stove from the Buck's Stove & Range Company. You know that myself and several others are enjoined from telling you, and we are not prepared to tell you, that the Buck's Stove & Range Company is unfair. There are a number of men who have been having suit brought against them for $240,000. That is not very much, between you and me; but a

cannot, in punishing for contempt, impose both a fine and imprisonment (*Moss* v. *United States,* 23 App. D. C. 475). It may do either, and in this case it may well be assumed that the court below determined that the most effective way for administering relief to the complainant and petitioner was by imprisoning the appellants rather than by finding them. However

few hatters in Danbury, Connecticut, are being sued for saying that Loewe & Company, hat manufacturers, of Danbury, Connecticut, are unfair. I am not prepared to say that this is in violation—that they are unfair.

"Of course, in the case of the Buck's Stove & Range Company, if I told you that the Buck's Stove & Range Company was still unfair, when I got back to Washington to-morrow, or some place where they say people play checkers with their noses—well, as I say, I am not prepared to tell you that these things are unfair. But there is no law, no court decision that compels you to buy them, nor does any law compel you to buy anything without the union label.

"But boycotting, I think—I am sure that the term itself has been coined within my lifetime. Boycotting, in its essence and effect and practice, has been in vogue since man began. I do not care what conception you may have of the beginning of human existence. I still assert that the word 'boycott' had its origin from the beginning of man's life. Of course, it was not known as the boycott.

"The term 'boycott' originated in Ireland about twenty-five years ago, when the people of the Green Isle were up in protest against British misrule, and they adopted a plan against a certain agent for one of the landowners. This agent was known by the name of Captain Boycott. They did not say they were going to boycott him, but they simply said, in the language of the time, that they were going to send —— to Coventry. Coventry was not an attractive country place, so that after the action had been accomplished in regard to this gentleman, the term, instead of sending anyone to Coventry, was changed to boycotting him! in other words, it was either an implied understanding or an expressed declaration that the people would have no dealings with him insofar as it was possible. And then came the word 'boycott,' and it has come into our dictionaries and into our lexigraphs, as well as into our court decisions. Now, my friends, I do not think that what it is human to do, what it is human and humane to do, can be, by any species of misinterpretation, expected to be an illegal or improper act. You cannot make me buy anything I do not want to buy. I can tell my friends to do likewise, and they have a right to do what I have a lawful right to do and I have a

this may be, it is not the form of punishment inflicted for con-
tempt that determines whether it is exercised for remedial
purposes and in the interest of the party complaining of the
violations of the orders or decrees of the court, or for purely
punitive purposes. It is to be determined by looking at the
nature and purpose of the suit in which a decree, judgment, or

---

legal right to tell them to do. No man has a vested right in my patron-
age. I have a right to bestow; I have a right to withhold and transfer
it to anyone else, and I want to say this about that, injunction or no
injunction, I won't buy a Loewe hat nor a Buck's stove or range."

And the said Samuel Gompers made the foregoing remarks in pursu-
ance of his plan of violating, disregarding, and disobeying the said order
of the court, and keeping the boycott against this petitioner in the minds
of the members of the American Federation of Labor and of the public,
and for the purpose of urging and encouraging the enforcement of the
said boycott against the petitioner, of deterring dealers from buying peti-
tioner's product or offering the same for sale, and of ruining and destroy-
ing its business.

XXII.

And, in pursuance of his said plan, and for the like purpose, thereafter,
in the editorial column of the May, 1908, number of the American Federa-
tionist, under his own name, at page 383, the said Samuel Gompers pub-
lished the following statement:

"I want to assure you on my word of honor that, so long as I live, I
will never buy a Loewe hat or a Buck's stove or range until these gentle-
men come into agreement with organized labor and grant us condi-
tions of fairness. Then they will get support and help. Until then, you
may call it by any other name,—boycott or no boycott,—but I won't buy
your hats anyhow."

XXIII.

And, in further pursuance of his said plan, and for the like purpose,
the said Samuel Gompers, in a public address delivered before a large
gathering of working people on to wit: the first day of May, A. D. 1908,
in the city of Chicago, Illinois, made the following statement:

"I might say just parenthetically about the hatters' case that you are
not now permitted to boycott the Loewe hats, but I want to call your at-
tention to the fact that there is no law compelling you to wear a Loewe
hat, nor has any judge issued a mandamus compelling you to buy a Loewe

order alleged to have been violated is entered, and the purpose and object of the proceedings which called into exercise the contempt process of the court, and, tested in this manner, we repeat that it is plain that, in this case, the exercise of the contempt process was exclusively remedial and in the interest alone of the petitioner, the appellee.

It should not be lost sight of that most of the decisions relied

---

hat. That applies equally to Mr. Van Cleave's stoves and ranges. And, by the way, I don't know why you should buy any of that sort of stuff. I won't; but that is a matter to which we can refer more particularly in our organizations."

And thereafter, for the purpose of more widely disseminating the said statement, the said Samuel Gompers published the same in the June, 1908, number of the American Federationist, at pages 467 and 468 thereof.

### XXIV.

And, for the purpose of more effectually carrying out his said plan, and for the like purpose, the said Samuel Gompers, thereafter, in the editorial column of the July, 1908, number of the American Federationist, at page 531 thereof, under his own name, published the following statement:

"The supreme court of the District of Columbia has made permanent the injunction issued by Justice Gould, enjoining the American Federation of Labor, its officers, its affiliated unions, and their members and friends from declaring that the Van Cleave Buck Stove & Range Company of St. Louis is on the unfair list of the American Federation of Labor, or the publication of that statement in the American Federationist. An appeal will be taken to the court of appeals of the District of Columbia, and, if necessary, to the United States Supreme Court. The injunction does not compel anyone to buy the Van Cleave Buck stoves and ranges, nor has any decree been issued compelling anyone to buy Loewe's hats."

### XXV.

Each and every of the issues of the American Federationist in this petition mentioned has been circulated and distributed, in large numbers, by the defendant Frank Morrison, secretary of the defendant American Federation of Labor, and circulating and distributing agent of the American Federationist, and the said issues have been so distributed by him, in disregard and violation of the order and decree of the court in the premises, among the various subordinate unions of the defendant American Federation of Labor, as described in paragraph IV. of the original bill in this cause, and also to the public, and extensively read throughout the coun-

on by the petitioner in support of its motion are decisions based upon the statutes and practice which regulates the jurisdiction of the various Federal courts in reviewing cases coming up from the United States district and circuit courts to the appellate tribunals. The jurisdiction of this court, as a reviewing tribunal, does not depend upon nor is it derived from those statutes and that practice, but from the act of Congress creating this

---

try; and the said Frank Morrison, in so doing, has been fully aware of the contents of the said publication, and prompted by the same purposes which controlled and influenced the defendant Samuel Gompers in preparing and delivering the writings and speeches so set out in the said issues of the American Federationist.

## XXVI.

Though the said Samuel Gompers, Frank Morrison, John Mitchell, and the other defendants to the original bill, their and each of their agents, servants, attorneys, confederates, and any and all persons acting in aid of or in conjunction with them or any of them, are, by the order of this court of December 18, 1907, restrained and enjoined pending litigation, and by the order of March 23d, 1908, perpetually restrained and enjoined from conspiring, agreeing, or combining in any manner to restrain, obstruct, or destroy the business of the complainant, or to prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory or business by defendants, or by any other person, firm, or corporation, and from declaring or threatening any boycott against the complainant, or its business, or the product of its factory, or against any person, firm, or corporation engaged in handling or selling the said product, and from abetting, aiding, or assisting in any such boycott, and from printing, issuing, publishing, or distributing through the mails, or in any other manner, any copies or copy of the American Federationist, or any other printed or written newspapers, magazine, circular, letter, or other document or instrument whatsoever, which shall contain, or in any manner refer to, the name of the complainant, its business or its product, in the "We Don't Patronize" or the "Unfair" list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them, or which contains any reference to the complainant, its business or product, in connection with the term "Unfair," or with the "We Don't Patronize" list, or with any other phrase, word, or words of similar import, and from publishing or otherwise circulating, whether in

court and its rules promulgated under the authority of the creating statute. Looking at that statute and the acts of Congress amendatory thereof, and the rules of this court, it will be seen that a writ of error is the mode of securing a review by this court only of the judgments of the police and juvenile courts; that, in all other cases, a review is accomplished by an appeal, and the mode of prosecuting the appeal depends in turn upon what court below the case comes from, whether an equity court

---

writing or orally, any statement, or notice, of any kind or character whatsoever, calling attention to the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been declared to be "unfair," or that it should not be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect or import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person, firm, or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States and Territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation to do or cause to be done any of the acts or things aforesaid; yet, by the acts, means, devices, and subterfuges aforesaid, the said Samuel Gompers, Frank Morrison, and John Mitchell have designed and sought to continue in force and effect, and have continued in force and effect, in wilful disregard, violation, disobedience, and contempt of the aforesaid order and decree of this court, the boycott against petitioner, and the conspiracy recited in the bill to destroy its business, which they and the other defendants have been and are, by the said order and decree, restrained and enjoined from continuing:

Wherefore, petitioner prays as follows:

(1) That a rule be laid upon the said Samuel Gompers, Frank Mor-

or a common-law court.   If the latter, then there must be a bill of exceptions or such equivalent of that as is recognized by well-established practice; but not so in the case of appeals from the equity court which bring up for review the whole record, and this tribunal in such cases reviews both the facts and the law.   There is no rule of this court that prescribes the method of prosecuting an appeal from the equity court from an order or decree adjudging a person in contempt, and the precedents

---

rison, and John Mitchell, requiring each of them to show cause, at a time to be fixed by the court in said rule, why the writ of attachment should not issue against him, and why he should not be adjudged by the court to be in contempt of its order and its decree in this cause, and be punished for the same.

(2) And that petitioner may have such other and further relief as the nature of its case may require.

[Seal.]                         The Buck's Stove & Range Company,
                                          By J. W. Van Cleave, President.

Attest:
     P. A. Samplin,
               Ass't Sec'y.
     W. C. Sullivan,
     Daniel Davenport,
     James M. Beck,
     J. J. Darlington,
               Solicitors.

State of Missouri,
     City of St. Louis, ss:

I, James W. Van Cleave, on oath say that I am president of the Buck's Stove & Range Company, the petitioner named in the foregoing and annexed petition, whose name I have subscribed and whose seal I have affixed thereto in my said capacity, in which capacity I make this affidavit; that I have read the said petition and know the contents thereof; that the allegations therein set forth upon personal knowledge are true, and that those set forth upon information and belief, I believe to be true.

                                                  James W. Van Cleave.

Subscribed and sworn to before me, this 17th day of July, A. D. 1908.
     [Seal.]                                        C. C. Crone,
                                    Notary Public, City of St. Louis.

My term expires July 6, 1909.